ANTISDALE v CITY OF GALESBURG

Docket No. 52198. Submitted April 8, 1981, at Lansing.—Decided
    September 21, 1981. Leave to appeal applied for.

William S. Antisdale and Martin De Vrou appealed the assess-
    ment of their federally subsidized, low-income housing project
    by the City of Galesburg to the Michigan Tax Tribunal. Follow-
    ing a hearing, a hearing officer rendered a proposed finding
    favorable to the petitioners. The respondent filed exceptions,
    and, following a subsequent hearing, the tribunal rejected the
    officer's finding and entered its own, raising the amount of the
    true cash value of the property from that of the hearing officer.
    The petitioners appeal. *Held:*

    The tribunal's determination of the true cash value of the
    petitioners' property using the market method of valuation,
    including the value of the property as a tax shelter, was
    supported by competent, material, and substantial evidence and
    did not involve an error of law or the adoption of wrong
    principles.

    Affirmed.

    BRONSON, J., dissented. He would hold that the market
    method of determining true cash value was inappropriate
    under the facts of the case because the sale of the property,
    involving the assumption of a nonmarket mortgage, could not
    be equated with a "cash" sale and because the usual selling
    price of comparable property could not be equated with cash
    sales for like reasons. In addition, he would hold that the
    consideration of the tax benefits to be derived by the property
    owner in determining true cash value was improper. He would
    note that the cost of reproduction method of valuation would be
    unlikely to be satisfactory because the cost of such property's
    construction seldom equals its value, and thus the capitaliza-
    tion of income method should have been selected as the most

REFERENCES FOR POINTS IN HEADNOTES
[1] [No reference]
[2-5] 72 Am Jur 2d, State and Local Taxation § 759 *et seq.*
    Sale price of real property as evidence in determining value for tax
    assessment purposes. 89 ALR3d 1126.

accurate under the circumstances. He would reverse and remand.

OPINION OF THE COURT

1. TAXATION — MICHIGAN TAX TRIBUNAL — APPEAL — CONSTITUTIONAL LAW.

Review of determinations of the Michigan Tax Tribunal by the Court of Appeals is limited to whether the tribunal committed an error of law or adopted a wrong principle, where fraud is not alleged (Const 1963, art 6, § 28).

2. TAXATION — ASSESSMENT OF REAL PROPERTY — APPEAL — CONSTITUTIONAL LAW.

Assessment of real property may not exceed 50 percent of the true cash value of the property, and on appeal the Michigan Tax Tribunal must apply the most accurate from among the market value, cost of reproduction, or capitalization of income methods under the facts in determining the true cash value (Const 1963, art 9, § 3).

3. TAXATION — ASSESSMENT OF REAL PROPERTY — TAX SHELTERS.

Assessment of real property may involve consideration of the value of the property as a tax shelter in determining its true cash value where the price which a willing buyer would pay at a private sale is determined by its tax-shelter status.

DISSENT BY BRONSON, J.

4. TAXATION — ASSESSMENT OF REAL PROPERTY.

*The sale price of real property does not determine necessarily its true cash value; sales which involve the assumption of non-market mortgages should not be equated with "cash" sales, nor should tax benefits to be derived by the property owner be considered for purposes of assessment; where the usual selling price of comparable property cannot be equated with a cash sale, the market approach for determining true cash value is inappropriate.*

5. TAXATION — ASSESSMENT OF REAL PROPERTY — SUBSIDIZED HOUSING.

*A determination of the true cash value of subsidized, low-income housing should employ the capitalization of income method; the market approach is inappropriate because the selling price of such property cannot be equated with a cash sale, and the cost of reproduction approach, likewise, is unlikely to prove satisfac-*

*tory because the value of the housing seldom equals its cost of construction.*

*Norman D. Katz,* for petitioners.

*Morris & Culver, P.C.,* for respondent.

Before: CYNAR, P.J., and BRONSON and D. F. WALSH, JJ.

CYNAR, P.J. Petitioners, owners of a federally subsidized, low-income housing project, appeal by right from a judgment of the Michigan Tax Tribunal entered June 3, 1980, by which the tribunal established the true cash value (TCV) of petitioners' housing project in 1978 and 1979 for purposes of tax assessment.

Petitioners appealed the 1978 and 1979 assessments of the property in question to the tribunal. A hearing was held on November 29, 1979, before a hearing officer, who rendered a proposed opinion finding that the TCV of the property in 1978 was $1,106,000, and in 1979 was $1,110,000. The proposed disposition was objected to, and the tribunal rejected the hearing officer's proposed opinion and made its own finding that the TCV of the property in 1978 was $1,740,000 and in 1979 was $1,691,000.

On appeal, petitioners contend that the TCV of the property as set forth in the hearing officer's proposed opinion was correct and that the determination of the tribunal should be set aside.

The property in question is a 120-unit, 15-building apartment complex which was constructed from 1974 to 1976. The property was built with Farmers Home Administration (FmHA) financing of 95 percent of its cost. FmHA issued four loans, secured by mortgages on the property, totalling $1,636,500. Two of the notes were for 50 years, and

two were for 40 years. Each note carried an interest rate on its face of from 7-3/4 percent to 9 percent. FmHA sets "basic" rents to be charged by the owner. A tenant pays either the basic rent or 25 percent of his or her income, whichever is greater. The owner must enter into an interest-credit agreement to charge only FmHA approved rents. Interest payments on the FmHA loans are waived to the extent that they exceed one percent. Any rent paid above the basic rate (*i.e.,* if 25 percent of the tenant's income exceeds the basic rent) is paid as additional interest to FmHA. The actual interest paid on this project has never exceeded 1-1/2 percent per annum. The owner of the project also agrees to a variety of other restrictions on his ownership rights, including the obligation to contribute to a repair reserve account. Sale of the property may not take place without FmHA approval.

Where fraud is not alleged, appellate review of determinations of the Tax Tribunal is limited to the question of whether the Tax Tribunal committed an error of law or adopted a wrong principle. Const 1963, art 6, § 28, *Northwood Apartments v City of Royal Oak,* 98 Mich App 721, 724; 296 NW2d 639 (1980).

Const 1963, art 9, § 3, provides that real property shall not be assessed to exceed 50 percent of the TCV. There are three well-recognized and accepted methods for determining "true cash value", *viz.:* market value as determined by comparable selling prices (market method), reproduction cost less depreciation (cost method), and capitalization of income (income method). *Consumers Power Co v Big Prairie Twp,* 81 Mich App 120, 130; 265 NW2d 182 (1978), *Wolverine Tower Associates v Ann Arbor,* 96 Mich App 780, 781; 293

NW2d 669 (1980). Any of the three methods may be used so long as it is reasonably related to fair market valuation and is accurate. It is the duty of the Tax Tribunal to select the method which, under the facts, is most accurate. *Ramblewood Associates v City of Wyoming,* 82 Mich App 342, 345-347; 266 NW2d 817 (1978), *Wolverine Tower, supra,* 782.

Petitioners contend that neither the market approach nor the cost approach produce an evaluation which bears a rational relationship to the TCV of the property and that the subject property can be evaluated properly only by using the income capitalization approach. Petitioners' appraiser used hypothetical market rents, expenses, and capitalization rate in his analysis. The basic principle behind petitioners' analysis was their contention that the subject property should be valued as if no favorable mortgage loan and no rent (and other) restrictions were present. They contended that two identical apartment complexes, sitting side-by-side, should receive the same evaluation regardless of special financing arrangements or federal regulation of rents and other property rights.

Respondent's appraiser used the market approach and contended that a sufficient number of sales of interests in FmHA projects existed to make this a reasonably reliable approach. He testified that the primary value of the projects to investors was as a tax shelter. Respondent's appraiser studied the unrecorded sales of six FmHA projects. The sales were not made public because FmHA approval is required for such a sale and, whether sought or not, approval had not been granted. FmHA projects were all sold on land contract, with the purchaser assuming the favora-

ble mortgage loan and the unfavorable rental restrictions and other obligations. FmHA projects were typically sold at a percentage over the remaining mortgage balance as shown on the face of the FmHA loans. Respondent's appraiser testified that the selling price for these projects ranged from 10 to 17 percent above the outstanding mortgage balance. He evaluated the subject property by multiplying the outstanding loan balance by 1.12.

It is true that the petitioners' income capitalization method previously had been approved as one method of determining true cash value, but that approval was made with the acknowledgment that no reliable information existed on which to base a comparable sales price determination.

The Legislature has defined TCV as "the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price which could be obtained for the property at a private sale and not at forced or auction sale". MCL 211.27(1); MSA 7.27(1).

The evidence presented by respondent supports a finding by the tribunal that reliable market data exists to allow a market method valuation of the property. Petitioners do not contend that the market data is inaccurate, but that it is not a proper indication of the value of the property because the value thus obtained is based not on the property itself but on its attendant financing and tax characteristics.

In the recent case of *Congresshills Apartments v Twp of Ypsilanti,* 102 Mich App 668; 302 NW2d 274 (1981), this Court considered the question of the Tax Tribunal's assessment of a federally financed and regulated housing project. *Congresshills* held that in assessing the property actual income and expenses must be considered as factors

in determining the TCV of the property and that the tribunal committed an error of law in basing its determination on hypothetical rental rates which the petitioner there legally could not obtain due to the federal regulations limiting rents.

*Congresshills* does not deal with the market method, but apparently considers only the capitalization of income method. It is instructive, however, in that it required the fact of the existing federal regulations to be considered. *Congresshills* effectively refutes petitioners' contention that physically identical properties in comparable locations must receive identical valuations in spite of different financial conditions.

By analogy to *Congresshills,* it is our opinion that the market method of valuation is appropriate in the instant case and is certainly more reliable than petitioners' income method.

*Congresshills* relies, in part, on the case of *CAF Investment Co v State Tax Comm,* 392 Mich 442; 221 NW2d 588 (1974). In dealing with that case, which held that property encumbered with an existing lease that provided a below market income could not be valued on the basis of market income, the *Congresshills* Court stated:

"The CAF decision stands for the obvious and unremarkable proposition that a buyer will be unwilling to purchase a property based upon current rental rates available in the market where he is unable to enjoy these rates due to an existing lease. It is equally obvious that a potential purchaser will not pay the market rate for an apartment complex where, as here, current market rental rates cannot be obtained due to governmental restrictions." *Id.,* 677.

We think it is equally obvious that where the chief value of a property in the marketplace is as

a tax shelter and the price that a buyer is willing to pay at a private sale is determined by that aspect of the property (indeed, it appears that the market for such property is created by the tax-shelter aspect of the property), it is correct to consider the value of the property as a tax shelter in determining the TCV of the property. The Tax Tribunal decision was supported by competent, material, and substantial evidence, and there was no error of law or adoption of wrong principles.

Affirmed.

D. F. WALSH, J., concurred.

BRONSON, J. *(dissenting)*. I respectfully dissent. In my opinion, the majority, by accepting the Tax Tribunal's determination of true cash value, includes within the assessed value of the property favorable financing terms and tax benefits derived by the buyer and does not reach a valuation of the property *qua* property.

An examination of the "comparable sales" used by respondent's assessor (and by the Tax Tribunal) to reach a market approach valuation reveals that none of these sales represented true cash purchases. In each case, a minimal cash payment was made to the seller, and the existing balances on various Farmers Home Administration (FmHA) mortgages were assumed. As the majority opinion shows, FmHA mortgages are on extremely favorable terms in respect to interest. Furthermore, the FmHA mortgages are amortized over a period of 40 or 50 years. I agree with the majority that a willing buyer would very likely "pay" the amounts determined by the Tax Tribunal to represent the true cash value of the subject property in 1978 and 1979. However, I believe that no willing buyer would expend these amounts but for the financing

terms available because of the FmHA mortgage. That is, while in 1978 a buyer might well have contracted to buy the property for $1,740,000, putting down some small percentage of this amount in cash and paying off the balance with the low interest rate over 40-odd years, no buyer would have given $1,740,000 for the property in an all-cash sale.

In my opinion, the commercial context of this taxation problem has obfuscated the point I make in the preceding paragraph and possibly has led my learned colleagues astray. I offer the following hypothetical situation involving identical tract houses sitting side-by-side in the same subdivision to more clearly delineate what I perceive to be the error in the majority opinion. Suppose both houses are for sale. Seller A is a relatively well-to-do retiree who does not immediately need the sale price of his home. Indeed, A is happy to take monthly payments from a buyer over a period of years and would consider these payments a pseudo-annuity. A wants to move to Florida and would like to sell his house quickly. Seller B, on the other hand, needs the entire sale price from his house forthwith. B plans to use the proceeds of the sale to embark on a new business venture. Furthermore, B can offer no creative financing arrangements.

A contracts with C for the sale of his house. C can only make a $10,000 down payment. However, C recently has been promoted within his corporation and has received a 50 percent increase in salary. The contract price for the sale of the house is set at $80,000. Of this amount, C puts down his $10,000 and agrees to pay the remainder at 7-1/2 percent interest over 25 years. B contracts with D. However, D must obtain a 30-year, 16 percent

conventional mortgage to buy B's home. Thus, the contract price established for the house is $65,000. As I read the majority opinion, A's house would be assessed at a true cash value of $80,000. I believe, however, that what A's buyer, C, has really purchased is a house along with favorable financing terms.

The courts of this state have held in various opinions that sales price does not necessarily determine the true cash value of property. See, for instance, *Fisher-New Center Co v State Tax Comm,* 380 Mich 340, 362; 157 NW2d 271 (1968). In *Village Green Co v Derderian,* 67 App Div 2d 714; 412 NYS2d 421 (1979), a panel of the appellate division of New York's Supreme Court was faced with a problem very similar to that confronting us. There, the lower court had disregarded the sales price of $1,065,000 when it valued the subject property. The court stated in a memorandum opinion:

"At the time of the sale, there was a favorable 7% mortgage on the premises for about $459,000. The purchaser paid $170,000 in cash and was given a remarkable purchase money mortgage of about $416,000, which, among other things, forgave all interest and payments for five years and then required payments at the rate of 4% for the next 10 years. The purchaser was also entitled to a $100,000 prepayment discount should it choose to pay within five years of the closing. Given the terms of the purchase money mortgage, the trial court was justified in finding that the connection between the purchase price of the property and its true fair market value was tenuous." *Id.*

The underlying premise of *Derderian,* which I adhere to, is that market sales data will not reflect the true value of the property when a nonmarket mortgage is assumed as part of the transaction.

Apart from the favorable financing terms, the Tax Tribunal also included within its determination of the property's true cash value income tax benefits derived by the buyers. The respondent's appraiser was forthright in admitting that the tax benefits which a high-tax bracket buyer could obtain in the acquisition of an FmHA property was included in his valuation determination. In his report the city's appraiser stated that the market value of FmHA properties are strictly as tax shelters and that, consequently, the appraisal was based upon this tax avoidance consideration. I do not believe the time has come that realty should be assessed in accordance with the tax benefits to be derived by the property's owner. The notion that federal tax benefits are a proper consideration in making property assessment decisions has been explicitly rejected by courts in other jurisdictions. In *Borough of Fort Lee v Hudson Terrace Apartments,* 175 NJ Super 221, 225-226; 417 A2d 1124 (1980), the court stated:

"We find no merit in the borough's claim that it was error to deny it access to the income tax returns of the taxpayer, Hudson Terrace Associates, for the tax years involved. The fact that some investors in income-producing real estate, such as the apartment buildings here involved, actually consider the income tax benefits to be derived by them personally in deciding whether to purchase such property, or do receive such benefits, has no place or relevance in the proper determination of the true value of the property by any of the conventional approaches to value. Accordingly, no purpose would have been served by allowing the borough to inspect the income tax returns sought by its motion. It is obvious that whatever income tax benefits a taxpayer may derive from his ownership of real estate will depend upon facts peculiar to him, such as his income tax bracket for the particular year, the method of

depreciation used and the current and unpredictable future provisions of the Federal income tax laws."

Once again returning to my hypothetical involving residential properties, suppose A's buyer, C, used one of the rooms in the house as a home office. Under the majority's decision, the assessing unit would have a good claim that the federal tax benefits which C would derive from his home office must be considered in determining the value of the property.

MCL 211.27(4); MSA 7.27(4) requires each assessment to be made at 50 percent of the property's "true cash value". MCL 211.27(1); MSA 7.27(1) basically defines true cash value as the usual selling price of a property in a nonforced, arm's length transaction. In rendering their decision, I believe that my colleagues neglect to give effect to the crucial word "cash". I agree with the majority that projects of the type under consideration here usually are sold with the attendant financing terms discussed earlier in this opinion. However, this "usual selling price" is not really a "cash" sale. I believe it is erroneous to equate a sale of property in which nonmarket mortgages are assumed as a sale indicative of "true cash value".

As the author of *Congresshills Apartments v Twp of Ypsilanti,* 102 Mich App 668; 302 NW2d 274 (1981), I am dismayed to see it cited as support for the proposition that the Tax Tribunal reached a proper determination of true cash value in this case. There is a significant difference between the consideration of the actual economic circumstances of the property and the consideration of favorable financing terms and tax benefits. Indeed, this fact is recognized in MCL 211.27(1); MSA 7.27(1), which provides in pertinent part:

"In determining the value the assessor shall also consider the advantages and disadvantages of location, quality of soil, zoning, existing use, present economic income of structures, including farm structures and present economic income of land when the land is being farmed or otherwise put to income producing use, quantity and value of standing timber, water power and privileges, mines, minerals, quarries, or other valuable deposits known to be available in the land and their value."

The quoted portion of the statute specifically requires that the "present economic income of structures" be considered by the assessor. The statutory provision does not state, however, that financing and tax factors should be evaluated by the assessor. I agree with the hearing officer, who found for the petitioners, that an evaluation of the full set of contractual rights and obligations, financing terms, and tax benefits is well beyond the scope of the expertise of the average real property assessor.

The majority notes that there are three accepted methods for determining "true cash value": the market approach, the cost of reproduction approach, and the capitalization of income approach. My colleagues further note that it is the duty of the Tax Tribunal to select the approach which is most accurate under the circumstances. *Wolverine Tower Associates v Ann Arbor,* 96 Mich App 780, 782; 293 NW2d 669 (1980).

In my opinion, the market approach used here is inappropriate. The value of the subject property was based on a comparison of other FmHA projects not truly sold for cash. In reality, the respondent's appraiser presented no valid comparable sales figures because there were no cash sales. Instead, each sale used by the city involved the buyer's assumption of a long term, low interest rate mortgage.

Initially, the city presented a cost of reproduction approach for determining the subject property's value. I also believe that this approach is likely to prove unsatisfactory because the value of a subsidized low-income housing project seldom equals the cost of its construction. See, *Washbridge Housing Corp v Tax Comm of the City of New York,* 60 Misc 2d 296; 303 NYS2d 308 (1968), *aff'd* 303 NYS2d 336 (1969). Indeed, this is a major reason that the federal government must provide substantial financing benefits to developers to get them to construct such housing.

While the capitalization of income approach also suffers from problems when applied in the context of federally subsidized housing, I believe it is the most likely method of accurately determining true cash value. The problem with the capitalization of income approach is the difficulty in determining what capitalization rate should be used. We did not discuss this factor in the capitalization of income equation in *Congresshills* because the capitalization rate utilized was not raised as an issue. I recognize that there may be difficulties in determining the proper capitalization rate, but at this time I make no comment on how this figure should be derived. Instead, I leave this problem to some future case where the capitalization rate is really the critical issue.

I would reverse and remand this case for further proceedings.