## TATHAM v CITY OF BIRMINGHAM

Docket No. 56078. Submitted March 17, 1982, at Detroit.—Decided September 21, 1982.

Charles H. Tatham and his wife, Patricia A. Tatham, owners of real property in Birmingham, Michigan, challenged the 1979 real property assessment for taxation purposes of their property by filing a petition with the Michigan Tax Tribunal. The petitioners alleged that the 1979 assessment for their property was arbitrary and capricious because their property was assessed at a ratio of 50% of the stipulated true cash value of the property which is in excess of the ratio of the average level of assessments to true cash value in the City of Birmingham, which petitioners claimed to be somewhere within the range of 34.81 to 43.32% of true cash value. The Tax Tribunal affirmed the property assessment, finding that the respondent had met its burden of showing that the average level of assessment within the taxing district was 50% of true cash value. The petitioners appeal. *Held:*

The property assessment approach used by the city and accepted by the Tax Tribunal constituted the adoption of a wrong principle. The petitioners adequately proved that the average ratio of assessed to true cash value in the taxing district for the year 1979 was 43%, and not 50% as the respondent claimed. The Court of Appeals declined to give effect to the stipulation between the petitioners and respondent that the petitioners' property was assessed at 50% of true cash value because the respondent's agreement to that stipulation was apparently premised on its belief that the assessment method it pursued would be accepted. Because the Court of Appeals rejected the respondent's approach as a means of accurately establishing the true cash value of the residential properties in the taxing district, this matter should be re-

REFERENCES FOR POINTS IN HEADNOTES
[1] 72 Am Jur 2d, State and Local Taxation § 787.
[2, 3] 72 Am Jur 2d, State and Local Taxation § 759 *et seq.*
Sale price of real property as evidence in determining value for tax assessment purposes. 89 ALR3d 1126.
[4] 72 Am Jur 2d, State and Local Taxation § 753.

manded to the Tax Tribunal to allow the petitioners to prove that, under a market analysis, their property was assessed at a level greater than 43% of true cash value.

Reversed and remanded.

1. TAXATION — APPEAL — TAX TRIBUNAL.

The Court of Appeals has only limited jurisdiction to review decisions of the Michigan Tax Tribunal; the Court is bound by the factual determinations of the tribunal and, where no fraud is alleged, review is· limited to the questions of whether the tribunal commited an error of law or adopted a wrong principle (Const 1963, art 6, § 28; MCL 205.753[1]; MSA 7.650[53][1]).

2. TAXATION — PROPERTY ASSESSMENT — CASH VALUE.

The cash value of real property for purposes of assessment means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price which could be obtained for the property at a private sale, and not at a forced or auction sale; in determining the cash value of property, an assessor should consider the advantages and disadvantages of location, quality of soil, zoning, existing use, present economic income of any structures, including farm structures and present economic income of land when the land is being farmed or otherwise put to income producing use, quantity and value of standing timber, water power and privileges, mines, minerals, quarries, or other valuable deposits known to be available in the land and their value (MCL 211.27; MSA 7.27).

3. TAXATION — ASSESSMENT — CASH VALUE.

True cash value may be determined by any of three methods: market analysis, reproduction cost less depreciation, and capitalization of income; the particular method should be chosen which is likely to render the most accurate results; the adjusted-cost or reproduction-less-depreciation method is most suitable for industrial facilities for which no market, an inadequate market or a distorted market exists.

4. TAXATION — TAX TRIBUNAL — CASH VALUE.

It is the duty of the Tax Tribunal to ascertain the true cash value of· a property when a dispute over the valuation comes before the tribunal and where neither party's valuation figure is accurate the tribunal should be free to reject both.

*Merrill, Tatham & Rosati, P.C.* (by *A. D. Rosati),* for petitioners.

*Beier, Howlett, McConnell, Googasian & Mc-Cann* (by *Stephen J. Hopkins*), for respondent.

Before: BRONSON, P.J., and CYNAR and J. R. ERNST,* JJ.

BRONSON, P.J. Petitioners appeal as of right from a Michigan Tax Tribunal judgment entered on January 30, 1981, affirming their 1979 real property assessment of $65,000. It is petitioners' contention that this assessment was discriminatory and nonuniform in that the ratio of assessed to true cash value of their property exceeded the average ratio applied to all other realty within the City of Birmingham (the taxing district).

A hearing was conducted before the tribunal on November 4, 1980. No proofs were presented going to the ratio of assessed to true cash value of petitioners' property because the parties stipulated that this property had been assessed at 50% of its true cash value. Petitioners asserted at the hearing that the average level of assessment in the taxing district lies somewhere between 34.81% and 43.32% of a given property's true cash value.

For the assessment year 1979, the City of Birmingham contracted with the Oakland County Equalization Department to appraise all of the property in the taxing district. Apparently, this contract was entered into because Birmingham's assessor resigned at an awkward time, and the city could not obtain another assessor with sufficient expertise and knowledge of the property within the taxing district to conduct the 1979 reappraisal.

Kelly Sweeney, who became the assessor for the City of Birmingham for the 1980 assessment year, indicated that he was present during a portion of

---

* Circuit judge, sitting on the Court of Appeals by assignment.

the 1979 reappraisal process. As to the method used to determine an assessed value for petitioners' property, Sweeney testified:

"Well, as was previously stated, the true cash value was arrived at through a reappraisal done by the Oakland County Equalization Department and through that reappraisal, every property was physically inspected. This property was entered on 12/18/1978. It was measured. The physical characteristics of the property were noted by the appraiser. It was placed—a class was placed on the property, age of construction was entered and all the physical characteristics were entered in and a value of the property was determined based upon the manual published by the State Tax Commission with respect to cost per square foot and so on and so forth and a cost approach appraisal was done, that was then compared to market sales over a 30-month period in arriving at an economic condition factor which was then applied to the depreciated reconstruction cost new of the property. That depreciated reconstruction cost new for the building was then added to the land value to arrive at a true cash value."[1]

William Hoover, assistant manager of the Oakland County Equalization Department, indicated that the basic adjusted-cost-of-reproduction approach described by Sweeney as used in determining petitioners' assessment was utilized throughout the taxing district. Hoover further indicated, however, that for the City of Birmingham market data from 1977 and the first six months of 1978 were used to establish the applicable economic

[1] Actually, as to petitioners' property, the method described by Sweeney was only the first step in the appraisal process. Using this adjusted cost of reproduction less depreciation approach, the Oakland County Board of Equalization decided that petitioners' property had a true cash value of $187,500. However, the first assessment for 1979 was for $76,200. Following an assessor's review this was reduced to $71,500. Then, following a complaint to the board of review, this was further reduced to $65,000.

factors. Sales data from 1976 were not used because the market had substantially changed from that year. Thus, instead of the normal 30-month study, as is applicable to the actual assessments made within the taxing district, only an 18-month study was used. No testimony was adduced which indicated with any specificity just how the "economic condition factor" (as stated by Sweeney) or the "economic factor" (as described by Hoover) was actually derived. From the record before us, all that we can ascertain with certainty is that this factor was somehow related to market activity for the year 1977 and the first six months of 1978. There is some suggestion in the record that the analysis proceeded as follows. The sales prices of those properties actually sold were compared to their then-assessed value. If, for example, in a given neighborhood within the taxing district, the assessed values of properties sold within the 18-month period were 10% under 50% of the sales price of those properties, the cost of reproduction less depreciation of any structures in the neighborhood, which had served as the original basis for the appraiser's asessment, would be increased by 10% (the economic factor) and added to the value of the land to achieve a true cash value figure.

Hoover admitted that actual sales prices of those properties sold during the 18-month period constituted just one factor in determining the true cash value, as determined by the Oakland County Equalization Department, of even those properties. Thus, any property sold during this period would be unlikely to have a 1979 assessment at 50% of the sales price. Instead, Hoover stated that true cash value was determined in accordance with State Tax Commission guidelines.

As to Birmingham, the Oakland County Equali-

zation Department was not only responsible for the 1979 reappraisal but also for conducting the 1979 equalization process. Hoover testified that the State Tax Commission required the use of a 30-month sales study to establish equalized value, and that this was done here.

The study in question was identical with the 18-month study used in the 1979 reappraisal process, except it also took into account 1976 sales for purposes of determining equalized value. For the 427 verified sales of properties which occurred in 1977,[2] the ratio of 1979 assessed value to sales price equaled an overall average of 49.84% for all properties sold. For the 306 verified sales which occurred in 1978, the overall assessed value totaled 41.76% of sales price. The combined 1977 and 1978 sales figures, as a ratio to 1979 assessed value, showed an average assessment rate of 45.80%. However, for the purpose of determining a state equalized value for the taxing district, Hoover and his staff included 1976 sales (for which no exhibit pertaining to sales figures and ratios to 1979 assessments was submitted). According to Hoover, the 1976 sales figures, when compared to 1979 assessments, resulted in a percentage ratio of sales price to 1979 assessed price in the upper fifties. Since the State Tax Commission required the use of the 1976 sales in determining state equalized value, the ratio of true cash value to assessed value (using the State Tax Commission approach) totaled 50%.

It was petitioners' contention that actual sales

---

[2] Only those sales for which the Oakland County Board of Equalization verified both the sales price and that the sale was a bona fide arm's length transaction were included in the data base for the 18- and 30-month studies. Reasons for rejecting a sale included unusual financing, whether personal property was also involved, whether the buyer and seller shared the same last name, and whether the sale was a probate sale.

figures should be the predominant factor used in the assessment process. Petitioners introduced exhibits setting forth a market analysis. For selected sales of properties during the first and second quarters of 1978, the 1979 assessed values, as a percentage of the actual sale prices, equaled approximately 43%.

The Tax Tribunal accepted the validity of the Oakland County Board of Equalization's approach, and rejected petitioners' market analysis. As such, the tribunal found that respondent had met its burden of showing that the average level of assessment within the taxing district was 50% of true cash value.

At the outset, we note that our review of Tax Tribunal determinations, when fraud is not alleged, is limited to questions of whether the tribunal committed an error of law or adopted a wrong principle. *Rogoski v Muskegon,* 101 Mich App 786, 789-790; 300 NW2d 695 (1980), and cases cited therein. Respondent asserts that the Tax Tribunal's finding of uniformity of assessment levels is a finding of fact not subject to our review. This contention is accurate when the underlying principles and legal analyses adopted by the tribunal are not erroneous. *Wolverine Tower Associates v Ann Arbor,* 96 Mich App 780, 783; 293 NW2d 669 (1980). However, petitioners here essentially assert that the factual finding of uniformity proceeded from the tribunal's underlying acceptance of "wrong principles". Therefore, we believe that petitioners' arguments must be considered on their merits.

Petitioners, relying on the statutory definition of "cash value", MCL 211.27(1); MSA 7.27(1), contend that the tribunal erred in accepting respondent's adjusted-reproduction-less-depreciation method of

determining the 1979 assessment levels, and that the finding of uniform taxation levels at 50% of true cash value in the taxing district was a product of both this improper assessment method and the fact that, for purposes of determining uniformity of taxation, the tribunal used a sales study extending over a 30-month period and back to 1976. MCL 211.27; MSA 7.27 provides as is pertinent:

"(1) 'Cash value' means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale. * * * In determining the value the assessor shall also consider the advantages and disadvantages of location, quality of soil, zoning, existing use, present economic income of structures, including farm structures and present economic income of land when the land is being farmed or otherwise put to income producing use, quantity and value of standing timber, water power and privileges, mines, minerals, quarries, or other valuable deposits known to be available in the land and their value.

                          *    *    *

"(4) Except as provided in subsection (5), property shall be assessed at 50% of its true cash value in accordance with section 3 of article 9 of the state constitution of 1963."

The tax day is December 31st of each year. MCL 211.2; MSA 7.2. We are thus concerned with whether the Tax Tribunal accepted a method of appraisal which was reasonably calculated to value all property within the taxing district at 50% of its true cash value on December 31, 1978.

True cash value need not be determined exclusively by reference to the usual selling price. There are three generally accepted approaches to

ascertaining true cash value: market analysis (the approach advocated by petitioners), reproduction cost less depreciation (an adjusted method of which was used by the respondent and accepted by the tribunal), and the capitalization-of-income method (which has no applicability to evaluating the worth of residential properties). See, on the accepted approaches to assessment issues, *Antisdale v City of Galesburg,* 109 Mich App 627, 630; 311 NW2d 432 (1981), and cases cited therein. Nonetheless, it is equally obvious that a method must be chosen which is likely to render the most accurate results. *Id.,* 631, and cases cited therein. Thus, we reject the implication in respondent's brief that the tribunal can select in its discretion any accepted method, regardless of the particular circumstances of the situation. Again, for instance, the Tax Tribunal would obviously have adopted a wrong principle in using the capitalization-of-income method to determine the true cash value of single-family residential properties in Birmingham.

In our opinion, the assessment approach accepted by the Tax Tribunal in this case constituted the adoption of a wrong principle. The adjusted-cost-of-reproduction-less-depreciation method is most suitable for industrial facilities for which no market, an inadequate market, or a distorted market exists. *Consumers Power Co v Big Prairie Twp,* 81 Mich App 120, 129-137; 265 NW2d 182 (1978); *Helmsley v Detroit,* 380 F2d 169, 170-172 (CA 6, 1967), *cert den* 389 US 976; 88 S Ct 479; 19 L Ed 2d 469 (1967).

In the instant case, petitioners proved that the 1979 assessments for properties sold over a period extending from November 23, 1977, through June 13, 1978, almost never equaled 49%, 50%, or 51%

of the earlier sales price.[3] Of 119 comparisons of sale prices to 1979 assessments, only five properties fell within the range of 49.0% to 51.0% of assessed value to sales price. The range of the ratio between 1979 assessed value and sales price extended from a low percentage of 29.4 to a high percentage of 58.14. The overall level of assessed value to sales price was approximately 43%. We accept the notion that the actual sales price of a property does not necessarily equal its true cash value for any number of reasons. We emphasize, however, that the comparison study relied upon by petitioners used sales which were deemed sufficiently verifiable and indicative of the market to be used in the Oakland County Equalization Department's 18- and 30-month market studies. It defies reason that, in just the few short months between the sale of the properties in issue and the tax date, 114 of the 119 properties analyzed by the petitioners failed to have "true cash values" which fell within a ratio of from 49% to 51% of sales price.[4] Indeed, the only explanations for this phe-

[3] The overwhelming number of sales analyzed actually occurred between the months of January, 1978, and June, 1978.

[4] MCL 211.27(1); MSA 7.27(1) includes a number of factors other than "usual selling price" which might affect true cash value. However, most of those would have no bearing on the assessments in this case and, to the extent any applicable factors might affect true cash value, only location was apparently considered during the assessment process. Moreover, there is absolutely no indication in the record that any distortions caused by those factors were not simply taken into account by the forces of the market and, thereby, increased or decreased "usual selling price" accordingly.

MCL 211.27(3); MSA 7.27(3) also provides for the exclusion of amounts paid for real property in certain circumstances. This provision provides:

"(3) Beginning December 31, 1978, a city or township assessor, a county equalization department or the state tax commission before utilizing real estate sales data on real property purchases, including purchases by land contract, for the purpose of determining assessments or in making sales ratio studies for the purpose of assessing or equalizing assessments shall exclude from the sales data the following amounts to the extent that the amounts are included in the real

nomenon by respondent's witnesses were that
"sales price" was just one of many factors consid-
ered in the appraisal process and that the State
Tax Commission guidelines required them to as-
sess the taxing district's properties in the fashion
respondent utilized. For instance, Mr. Hoover indi-
cated:

"The assessor is not supposed to establish his true
cash value on, for assessment purposes, based on indi-
vidual sales. He's supposed to establish the level of
assessment based on a 30-month study and it's his job
to develop the correct level of assessment or a 50%

property purchase price and are so identified in the real estate sales
data or certified to the assessor as provided in subdivision (d):
    "(a) Amounts paid for obtaining financing of the purchase price of
the property or the last conveyance of the property.
    "(b) Amounts attributable to personal property which were included
in the purchase price of the property in the last conveyance of the
property.
    "(c) Amounts paid for surveying the property pursuant to the last
conveyance of the property. The legislature may require local units of
government, including school districts, to submit reports of revenue
lost under subdivisions (a) and (b) and this subdivision so that the
state may reimburse those units for that lost revenue.
    "(d) On or after December 31, 1978, the purchaser of real property,
including a purchaser by land contract, may file with the assessor of
the city or township in which the property is located 2 copies of the
purchase agreement or of an affidavit which shall identify the
amount, if any, for each item listed in subdivisions (a) to (c) of this
subsection. One copy shall be forwarded by the assessor to the county
equalization department."
It appears that when the Oakland County Board of Equalization was
confronted with one of these situations, it simply eliminated the sale
from the data base.
    In *Antisdale v City of Galesburg,* 109 Mich App 627; 311 NW2d 432
(1981), two members of this panel, Judges CYNAR and BRONSON,
disagreed over whether sales price should be taken as reflecting true
cash value where extremely favorable financing terms were part and
parcel of the transaction. Judge CYNAR's majority opinion held that,
under the circumstances, sale prices were a proper indication of true
cash value. Judge BRONSON's dissenting opinion took the position that
what was being purchased was the property *and* a favorable financing
package and that sales price consequently reflected more than true
cash value. In any case, there is no indication that here the assessors'
appraisals of the 119 properties used in petitioners' sales analysis
were discounted because of financing terms.

level based on a 30-month study and still maintain equity between all the properties within the unit."

The record before us clearly indicates that the State Tax Commission requires a 30-month sales study to be prepared for purposes of state equalized valuation. It is less clear whether the State Tax Commission mandates any particular method for conducting the yearly assessments. For instance, while Hoover testified that a 30-month study was supposed to be used for assessment purposes, he acknowledged that only an 18-month study was used here. Thus, if the State Tax Commission does mandate the use of the 30-month study in the yearly reappraisal, as opposed to equalization, process, the Oakland County Board of Equalization did not feel bound by the tax commission directive. In any case, the State Tax Commission cannot permissibly mandate that an assessment procedure be used which does not result in a relatively accurate "cash value" for each property and an assessment at 50% of this cash value on the applicable tax date. See MCL 211.27(1), 211.27(4); MSA 7.27(1), 7.27(4).

The problem in this case seems to be that the Oakland County Board of Equalization was more interested in achieving a state equalized valuation factor of 1.00 than it was in accurately determining the true cash value of the properties within Birmingham on December 31, 1978. Thus, while for purposes of state equalization the Oakland County Board of Equalization, using tax commission procedures, was able to show an overall average ratio of cash to assessed value of 50%, the actual assessments of individual properties within the taxing district only equaled 50% of true cash value in rare cases.

The State Tax Commission's scheme for equaliz-

ing values, although uniform throughout all 83 counties, suffers from the fact that the housing market is unlikely to remain stable over a period of 30 months. In conducting its assessments of properties in Birmingham, the Oakland County Board of Equalization corrected for the inadequacies of the 30-month study by generally undervaluing the property in Birmingham so as to be able to achieve a state equalized value of 1.00. Had the board of equalization actually rendered 1979 assessments at 50% of true cash value on December 31, 1978, the taxing district would have had a state equalized value factor of less than 1.00. Respondent asserts that the 30-month sales study is advantageous to the taxpayer in inflationary times. This contention is true for most taxpayers, but all this means is that property owners end up with assessments less than 50% of the true cash value of their property on the applicable tax date of each year because the effects of inflation are discounted. Correspondingly, however, in a deflationary market, the 30-month study will consistently overvalue the taxpayers' properties. Moreover, in conceding that the 30-month sales study insulates the taxpayer from inflationary increases and deflationary decreases, respondent is virtually admitting that its method of calculating cash value has little to do with the true cash values of real properties on December 31st of each year.[5]

[5] The purpose of the state equalization process is primarily to insure uniformity of taxation between all taxing units. Thus, to the extent that the housing markets in the entire state are either all stable, all increasing, or all decreasing, the use of the 30-month sales study in determining state equalized value, as opposed to true cash value, does no real harm and may be beneficial due to the existence of an expanded data base. However, as a means of determining true cash value on December 31st of each year, the 30-month sales study is only effective in an unchanging market. Had the Oakland County Board of Equalization been more concerned with correctly assessing the property in Birmingham at 50% of true cash value on December

It is our opinion that petitioners have adequately proved that the average ratio of assessed to true cash value in the taxing district for the year 1979 was 43%, and not 50% as respondent claims. If we were to give effect to the stipulation between petitioners and respondent, that petitioners' property was assessed at 50% of true cash value, we would have to conclude that petitioners were eligible for a reduction of their property's assessment to $58,050, representing 43% of the stipulated true cash value of $130,000, based on the uniformity clause of the state constitution, Const 1963, art 9, § 3. *Brittany Park Apartments v Harrison Twp,* 104 Mich App 81, 87-88; 304 NW2d 488 (1981). However, we decline to give effect to the stipulation.[6] Respondent's agreement to this stipulation was apparently premised on its view that the assessment method it pursued would be accepted. However, we held in *Brittany Park,* that respondent's adjusted-cost-of-reproduction-less-depreciation method should not have been used, and a market approach should have been utilized in-

31, 1978, the overall assessments would have been higher, but because of the lag time embodied in the 30-month state equalization technique, the state equalized value for these properties would have had an equalization factor of less than 1.00.

Assuming the overall housing market in the State of Michigan over the 30-month period of 1976, 1977, and the first six months of 1978 was accurately reflected by the Birmingham housing market, because of the lengthy lag time, it would seem that the equalization process was actually equalizing property values at approximately 43% of true cash value, as opposed to 50%. Correspondingly, now that the housing market has depressed, a current 30-month sales study used for equalization purposes might well show, because of the lag time, that the state is equalizing property values at some percentage above 50% of true cash value.

[6] Basically, the respondent should never have agreed to a blanket stipulation that petitioners' property was assessed at 50% of true cash value. Since it was obvious that petitioners intended to contest the assessment approach that respondent utilized, respondent should have insisted that petitioners prove under the approach they advocated that its property was assessed at a higher ratio to true cash value than all other properties in the taxing district.

stead. Before the Tax Tribunal, petitioners' attorney admitted that the reason he was accepting respondent's appraisal of petitioners' property at $130,000 was because this appraised price was "probably low". Thus, petitioners would have us utilize their method for determining the ratio of assessed to true cash value of all property within the taxing district except their own. As to their own property, they want us to use respondent's method of valuation. To do so would result in an invalid and incongruous comparison.

The Tax Tribunal is not required to accept the valuation figure advanced by the taxpayer, the valuation figure advanced by the assessing unit, or some figure in between these two. It may reject both the taxpayer's and assessing unit's approaches. See *Clark Equipment Co v Leoni Twp*, 113 Mich App 778; 318 NW2d 586 (1982). The Tax Tribunal acknowledged that: "We must * * * make our own finding of true cash value." See *Consolidated Aluminum Corp, Inc v Richmond Twp*, 88 Mich App 229; 276 NW2d 566 (1979). Here, however, the tribunal agreed that respondent's adjusted-cost-of-reproduction-less-depreciation method of determining true cash value was proper and, in accord with this method, that petitioners' property was properly assessed at 50% of its true cash value. In light of the fact that we reject respondent's approach as a means of accurately establishing the true cash value of, at least, the residential properties in the taxing district, we remand this matter to the Tax Tribunal to allow petitioners to prove that under a market analysis their property is assessed at a level higher than 43% of true cash value.[7]

---

[7] Since petitioners concerned themselves only with properties actually sold, it is unclear how they believe their market approach can be extended to other properties within the taxing district which were not

Remanded for proceedings consistent with this opinion. If petitioners choose to pursue their action, they must move for a hearing on remand within 30 days of the release of this opinion. We retain jurisdiction. No costs, a public question being involved.

---

sold. It is our opinion, however, that an examination of the physical characteristics of petitioners' property in comparison with similar properties sold is probably the most efficacious approach. Thus, the appraisal method would be somewhat like that which Mr. Sweeney specified was actually done, only reversing the order in which actual market sales are considered from a last step to a first step. Instead of using the market data solely as a means of adjusting the true cash value figure derived from the cost-of-reproduction-less-depreciation method adopted by respondent, the market data would be the starting point from which adjustments of all varieties would proceed.