MEADOWLANES LIMITED DIVIDEND HOUSING ASSOCIATION v
CITY OF HOLLAND

Docket No. 76133. Submitted May 7, 1985, at Grand Rapids. Decided
October 16, 1986. Leave to appeal denied, 428 Mich —.

Meadowlanes Limited Dividend Housing Association purchased a
low-income apartment project in Holland, Michigan. The terms
included assumption of a Department of Housing and Urban
Development subsidized loan. Meadowlanes petitioned the Tax
Tribunal to reduce the 1981 tax assessment on the project. The
petition was amended to include review and reduction requests
for the years 1982 and 1983. The tribunal heard testimony to
the effect that the true cash value of the project could be
determined by computing the sum of the present values of the
mortgage assumed by the petitioner, the petitioner's equity by
calculating the value of the cash flow, the tax shelter value and
the reversions. The tribunal calculated each and determined a
true cash value of the project. The City of Holland appealed.

The Court of Appeals held:

1. Any error committed by the tribunal in allocating the
burden of proof was harmless since the tribunal found that
petitioner met its burden of proof in establishing true cash
value.

2. The tribunal did not clearly err in adopting the valuation
method of computing the equity and mortgage values of the
property.

3. The tribunal did not err in reducing the subsidized mort-
gage to its cash equivalent in determining true cash value.

4. The tribunal erred in failing to consider the value of the
mortgage subsidy in determining true cash value.

Reversed and remanded with instructions.

1. Taxation — Appeal — Assessment of Real Property — Tax
Tribunal.
Factual findings of the Michigan Tax Tribunal in real property

REFERENCES

Am Jur 2d, State and Local Taxation §§ 753 et seq., 782-787.

Requirement of full-value real property taxation assessments. 42
ALR4th 676.

Income or rental value as a factor in evaluation of real property for
purposes of taxation. 96 ALR2d 666.

assessment cases are final where supported by competent and substantial evidence, and, absent fraud, review of tribunal decisions is limited to determining whether the tribunal made an error of law or adopted a wrong principle.

2. TAXATION — ASSESSMENT OF REAL PROPERTY — TRUE CASH VALUE — TAX BENEFITS — SUBSIDIES.

To the extent that tax shelter benefits and government subsidies to a typical owner affect the usual selling price of a piece of property, they are properly included within the true cash value of the property.

3. TAXATION — ASSESSMENT OF REAL PROPERTY — TRUE CASH VALUE — MORTGAGES.

When determining the true cash value of a piece of property on which there is a mortgage at a below-market interest rate by a method which takes the mortgage into account, it is proper to reduce the mortgage to its cash equivalent.

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *Kenneth W. Beall*), for plaintiff.

*Cunningham, Mulder & Breese, P.C.* (by *Andrew J. Mulder*), for defendant.

Before: SHEPHERD, P.J., and R. M. MAHER and W. R. PETERSON,* JJ.

PER CURIAM. Respondent, City of Holland, appeals as of right from a January 6, 1984, opinion and judgment of the Michigan Tax Tribunal in a controversy over assessments for the years 1981, 1982 and 1983 on a 118-unit apartment project owned by petitioner, Meadowlanes Limited Dividend Housing Association, and located in Holland, Michigan.

Petitioner purchased the apartment project in March, 1973, by paying the original developer, the Holland Zeeland Area Nonprofit Housing Association, $31,532 in cash, assuming the housing au-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

thority's $2,232,000 mortgage and placing about $400,000 into reserve accounts in escrow.

The mortgage was obtained through the Michigan State Housing Development Authority (MSHDA). It was subject to federal regulation as part of a § 236 program under the National Housing Act, 12 USC 1715z-1, and a § 8 program under the United States Housing Act of 1937, 42 USC 1437f. Those programs are designed to assist developers in constructing housing for low income families. Under the programs, the Department of Housing and Urban Development (HUD) subsidizes the mortgage by paying interest over one percent. In this case, although the interest rate was 6.35 percent, petitioner paid only one percent, HUD subsidizing 5.35 percent as an interest reduction payment under 12 USC 1715z-1(c). In return for the subsidy, federal regulations limit the maximum return on plaintiff's investment to not more than six percent. Moreover, rents charged by petitioner are regulated by a prescribed formula. Other restrictions also apply.

In 1981 petitioner disputed its real property tax assessment but was denied a review or reduction of the assessment by the city. On June 26, 1981, petitioner petitioned the tribunal to review and reduce the 1981 assessment. Later, petitioner amended its petition to seek review and reduction of the 1982 and 1983 assessments. The assessed values on the rolls for 1981 through 1983 were:

| 1981 | $  938,600 |
| 1982 | $1,427,800 |
| 1983 | $1,427,800 |

At the August 8, 1983 tribunal hearing, respondent, City of Holland, presented the testimony of

appraiser Richard Cherney, who had analyzed the true cash value of Meadowlanes pursuant to cost, income and market approaches. In making his appraisal, Cherney deviated from the city's original valuation and based his final valuation on his determination that subsidized housing projects in general sell for approximately 124 percent of the mortgage balance. Under this methodology, according to Cherney, the true cash value of the property in question was $3,104,992 for 1981, $3,076,258 for 1982, and $3,045,697 for 1983, based upon the mortgage balance that existed during each of those years.

Petitioner presented the testimony of appraiser Laurence Allen who advocated what he termed an "income approach . . . using the mortgage equity method." Under this method, Allen testified that the true cash value of Meadowlanes could be determined by computing the present cash value of the mortgage assumed by petitioner, the present cash value of petitioner's equity in the land determined by calculating the value of the cash flow, the present cash value of the property as a tax shelter and the present cash value of the reversions. The sum of those figures constituted the true cash value of the property. Using Allen's analysis, Meadowlanes contended that the true cash value of the apartment complex was $860,000 for 1981, $1,000,000 for 1982, and $1,100,000 for 1983.

The tribunal accepted petitioner's appraisal method and adopted true cash values as follows:

| | |
|---|---|
| 1981 | $1,000,000 |
| 1982 | $ 800,000 |
| 1983 | $1,000,000 |

The tribunal also found that all of the city's proposed methods for valuing the property were unacceptable.

The city raises four issues on appeal.

I

The city contends that the tribunal judge improperly allocated the burden of proof between the parties, resulting in an improper review of the evidence at trial. Therefore, the city says, the case should be remanded to the tribunal for a new trial or review of the evidence under the proper statutory evidentiary standard.

At trial, the city contended that the assessments imposed upon petitioner for years 1981 through 1983 were erroneous because they were below the normal fifty percent assessment rate. Hence, the city offered no proof to support the original assessments but only evidence to show that they were erroneous. In its post-trial brief respondent claimed that the burden of proof was upon petitioner to establish the true cash value of its property. The tribunal judge, however, in her opinion and judgment stated that the burden of proof fell equally upon the parties since respondent did not offer any proof to support the original assessments but rather sought to have the tribunal increase them.

MCL 205.737(3); MSA 7.650(37)(3) provides that the burden of proving the true cash value of the property in question in all tax assessment cases is upon the petitioner. However, this case differs from the typical case since the city also disputed the original assessments even though it did not file a cross-petition. If the city had filed a cross-petition to have the tax assessments raised, it would have been a petitioner just like Meadowlanes and

would have had the burden of proving that the true cash value of the apartment project was higher than its original valuations. However, because respondent did not file a cross-petition, it was not a petitioner. Hence, the question arises whether the city should have been allocated an equal portion of the burden of proof.

The cases cited by respondent are distinguishable since in those cases the assessing agencies did not dispute the original assessments. Rather, the assessing agencies argued that their original tax assessments were entirely appropriate. See *Ahli Development Co v Orion Twp,* 110 Mich App 764; 314 NW2d 479 (1981); *Consolidated Aluminum Corp, Inc v Richmond Twp,* 88 Mich App 229; 276 NW2d 566 (1979). Therefore, since this case is distinguishable from the typical case and because respondent attempted to establish a new cash value for the property, it was appropriate for the tribunal judge to place the burden of proof upon respondent to at least establish that the original assessments were too low. Moreover, the tribunal judge found that petitioner's theory was acceptable and "the best indication" of the value of its property. The tribunal judge found that petitioner met its burden of proof to establish the true cash value of its property. Therefore, any error she may have made in allocating the burden of proof was harmless. MCR 2.613(A).

II

The city argues that the tribunal judge committed reversible error by adopting petitioner's variant valuation approach because it is not reasonably accurate and was not supported by proof of comparable sales to establish fair market value.

Petitioner's appraiser asserted, and the Tax Tri-

bunal accepted and adopted, a variation of the traditional approaches to valuation. The approach values the subject property by computing two components: 1) the equity component; and 2) the mortgage component.

The equity component is obtained by determining three figures. First, the present value of the project's cash flow in the form of distributions to the owners is computed. Second, the tax shelter value to the investor is determined. Finally, the negative impact of federal income tax recaptures rules is established and subtracted from the sum of the cash flow and tax shelter components. The addition of these three figures establishes the equity component.

The second component, the mortgage component, is essentially derived by determining the amount of money a prospective purchaser would need to invest as of each tax date in order to produce enough income to pay off the mortgage according to its terms. Once the mortgage component is established it is added to the equity component to determine the true cash value of the property.

Applying the above methodology to the subject property, petitioner's expert found for the year 1983:

| | |
|---|---|
| Present Value of Cash Flow: | $ 53,649 |
| Present Value of Tax Shelter: | $ 410,579 |
| Present Value of Tax Recapture: | $ —19,908 |
| Total Present Value of Equity Component: | $ 444,320 |

In addition, petitioner's appraiser determined that the present value of the $2,456,207 mortgage was approximately $660,000, based upon the price at which a purchaser of the mortgagee's interest would buy the one percent subsidized mortgage. The addition of the equity component ($444,320)

and the mortgage component ($660,000) resulted in a true cash value rounded off to $1,100,000.

This Court's review of decisions of the Tax Tribunal, in the absence of fraud, is limited to determining whether the tribunal made an error of law or adopted a wrong principle; the factual findings of the tribunal are final, provided they are supported by competent and substantial evidence. *Antisdale v City of Galesburg,* 420 Mich 265, 277; 362 NW2d 632 (1984).

Const 1963, art 9, § 3, requires the Legislature to provide for a determination of true cash value of property that is subject to uniform general ad valorem taxation. The Legislature carried out that constitutional command by enacting MCL 211.27; MSA 7.27, which provides that the term "cash value" means the usual selling price at the place where the subject property is at the time of assessment. As a result of that broad definition of true cash value, the duty to determine what methods are appropriate for determining true cash value has fallen upon the courts. *Antisdale, supra,* p 276. Generally, there are currently three methods of valuation which are acceptable to the Michigan Tax Tribunal and the courts. These methods are the cost-less-depreciation approach, the capitalization-of-income approach, and the market approach. However, the development or use of other valid methods for valuation has never been precluded. *Id.* Other methods of valuation are appropriate if they are accurate and reasonably related to the fair market value of property. *Safran Printing Co v Detroit,* 88 Mich App 376; 276 NW2d 602 (1979).

In considering whether other valuation methods are accurate, the Supreme Court stated that, to the extent tax benefits to a typical owner affect the usual selling price of a piece of property, they are properly included within the true cash value

of the property. *Antisdale, supra,* p 285. According to the Court, it is necessary to consider the value of a subsidized housing project's tax shelter benefits in order to make an accurate valuation of such properties. *Id.* Hence, it was proper for the tribunal in this case to adopt petitioner's methodology which included a computation as to tax shelter benefits of the project. Indeed, *Antisdale* suggests that, in cases of subsidized housing, including the value of the project's tax shelter benefits in the overall valuation of the property is the most accurate methodology. Hence, as long as the underlying computation of each of the components in petitioner's methodology is accurate, it is an appropriate method of valuation given the subsidized nature of the property in question.

The fact that each of the components was accurately determined is evidenced by petitioner's appraiser's testimony. According to him, the first equity component, cash flow, is determined by considering what the maximum cash flow of the project would be in light of the government's requirement that an owner's income not exceed six percent of his investment. According to Allen, by law the maximum net income allowed is $109,782. After subtracting from this figure the $79,931 of debt service and the required reserve account payments of $18,139, the remainder of $11,712 constitutes the maximum yearly cash flow. Based upon a fifteen-year holding period and a 20.5 percent rate of investment return, Allen determined that the present value of the cash flow is $53,649.

The second equity component, the present value of the tax shelter benefits, was determined to be $410,579. This figure was obtained by determining the present value of fifteen years of tax deprecia-

1986]     MEADOWLANES v HOLLAND          247

tion benefits to a typical taxpayer in the fifty-percent-rate bracket.

The third equity component was arrived at by determining how much money an individual would have to presently invest in order to have a sufficient amount of money at the end of the fifteen-year holding period to pay the tax imposed under the recapture rules of the Internal Revenue Code. This computation was based upon a "worst case assumption," i.e., that the property would be sold at the end of the fifteen years at $1.00 over the mortgage balance or $2,900,000. The present value of the reversion was computed as a negative $19,-908.

Finally, the mortgage value of petitioner's interest was established by determining how much an individual would have to invest today in order to earn enough interest to offset the $6,660.90 monthly payments. This amount, established by using a discount rate of 11.8 percent, is approximately $660,000.

Viewing the above formula in light of the requirement that valuation methods be reasonable and accurate, the Court is satisfied that the method meets those requirements at least to the extent that it contains a precise and verifiable formula which can be utilized to establish each component figure. The only flaw we perceive in the methodology is that a component of the mortgage factor was left out, causing the method to be in violation of the requirement that the formula be reasonably related to fair market value of the property. The methodology does not take into consideration the total value of the mortgage.

According to petitioner, the total monthly mortgage payments are $15,181.64. But, petitioner's share of the payment is only $6,660.90 per month since the government pays the other $8,520.74.

However, in establishing the present value of the mortgage, petitioner's appraiser considered only the $6,660.90 monthly payments in the formula, excluding the $8,520.74 monthly payments. Hence, there was over $1,500,000 of mortgage value not included in petitioner's calculations.

Based upon this fact, although the methodology is accurate and precise, it may not reflect the true cash value of the property since, as we discuss in Issue IV, the government subsidized mortgage interest payments are to be considered in setting the value of this subsidized property.

### III

Respondent argues that the tribunal judge committed error requiring reversal by using a formula involving cash equivalence. Sales involving one percent financing, according to respondent, should not be discounted to their cash equivalents because sales of subsidized housing projects generally involve low interest financing. Such discounting ignores a buyer's tax shelter motivation for purchasing the property and the resulting value is different from the sales price. Respondent relies upon *Antisdale v City of Galesburg,* 109 Mich App 627; 311 NW2d 432 (1981), for the proposition that discounting subsidized project sales to determine cash equivalent is not mandated. However, the Michigan Supreme Court reversed this Court's opinion in *Antisdale.* Therefore, respondent's reliance upon this Court's opinion in that case is inappropriate. Indeed, the tribunal's explanation of and justification for reducing a mortgage to its cash equivalent in this case was quoted with approval in *Antisdale,* 420 Mich 281-282.

### IV

Finally, the city contends that the tribunal erred

by failing to include the value of the mortgage subsidy, the government's interest reduction payments, in the calculation of true cash value.

In *Congresshills Apartments v Ypsilanti Twp (After Remand)*, 128 Mich App 279; 341 NW2d 121 (1983), a panel of this Court held that the interest subsidy could not be included in a real property valuation because it was an intangible asset or benefit and not "real" or "tangible" property subject to taxation under Const 1963, art 9, § 3. 128 Mich App 283. Further, the Court said, inclusion of the interest in valuation would ignore the federal government's purpose to encourage development of low income housing.

We respectfully disagree. We believe the rationale of *Congresshills* has been superseded by *Antisdale v City of Galesburg, supra.*

In *Antisdale* the Supreme Court held that the tax benefits of investing in federal low income housing projects could be considered in the assessment process as an intangible affecting true cash value.

> The foremost value of these properties is found in the tax benefits they generate to the owner. See, generally, *Kentwood Apartments v City of Kentwood,* 1 MTTR 295 (1977). Indeed, since property such as that involved in the present case has little capacity to earn income, the availability of the tax benefits may be the only reason to purchase such property. To the extent that tax benefits to a typical owner affect the "usual selling price" of property, they are properly included within the true cash value of the property. Tax benefits, like deed restrictions, *Helin v Grosse Pointe Twp,* 329 Mich 396; 45 NW2d 338 (1951), and zoning classifications, *Kensington Hills Development Co v Milford Twp,* 10 Mich App 368; 159 NW2d 330 (1968), of course, are not real property. Nevertheless, such incorporeal items, not taxable in and of them-

selves, can increase or decrease the value of real property, and that amount should be reflected in the assessment process. [420 Mich 285.]

Just as tax benefits affect the selling price of federally subsidized property, so does the existence of an interest subsidy attached to a mortgage being assumed by the purchaser. The interest subsidy is a premiere feature of the tax shelter. As the *Antisdale* Court noted: "Without the federally subsidized mortgage such properties would be nearly worthless." 420 Mich 284.

In *Washtenaw County v State Tax Comm*, 422 Mich 346, 365; 373 NW2d 697 (1985),[1] the Supreme Court cautioned that "any method of assessment or equalization of real property that ignores significant and ascertainable components of a sales price which are relevant to the cash value of the property—be they usual components or not—is flawed." That a property carries with it a one percent interest rate on a mortgage is a significant and ascertainable component of the sales price and is relevant to the cash value of the property.

*Washtenaw County* held that "creative financing" cannot be included in the determination of true cash value of real property. But an interest subsidy is closer to factors such as property tax and the cost of borrowing (which can be considered under *Washtenaw County*, 422 Mich 366) than to creative financing. Creative financing does not contribute to the value of the property itself, but is rather a method whereby one or more of the parties can enhance the value of a particular transaction, at that time, on a particular property. Creative financing, however, may not be available on the same property at some other time to the

---

[1] At the time of oral arguments in this case, *Washtenaw County* had been argued in the Supreme Court, but had not been decided.

same or other parties. An interest subsidy, on the other hand, when it is available under federal law, accrues to the property itself and should be considered in the valuation process.

Section 236 properties are subject to unique restrictions and advantages. All of them, including the subsidized interest feature, must be at least considered in the assessment process. The Pennsylvania Supreme Court noted in *In re Appeal of Johnson Associates,* 494 Pa 433, 439; 431 A2d 932 (1981):

> However, the Court of Common Pleas expressly rejected the view that realistic consideration should be given, in the market value inquiry, to the effect of rent and sale restrictions affecting the taxpayer's property under terms of the Section 236 subsidy.
>
> . . . [Standard omitted]. By this standard, the certitudes of a property's not being presently saleable, and of its not having a potential for rental profit increases, both of which are factors unique to Section 236 property, are clearly matters relevant to the question of value and must *at least be considered.* See also *Flamingo Apartments, Inc v Board of Revision of Taxes,* 383 Pa 223; 118 A2d 197 (1955). [Emphasis in original.]

*Community Development Co of Gardner v Bd of Assessors of Gardner,* 377 Mass 351; 385 NE2d 1376 (1979), makes the same point. There, the assessor, using a capitalization of income approach, based its estimate of a § 236 project's gross annual income on "fair market" rents, rather than on the "basic monthly rental rates" to which the project was restricted. In reversing, the Supreme Judicial Court noted that assessing authorities cannot ignore features unique to § 236 housing.

In our view the board erred in not taking into

account the restrictions placed by Federal regulations on the rent the company could actually receive from the housing project. The board held that the "fair market rentals" represented the project's earning capacity. However, the company could not retain any amount in excess of the basic rental charge. Moreover, the company was forbidden from charging the fair market rental to low income families. Thus, the board based its estimate of gross income on hypothetical rent receipts in excess of those allowed by law. See *Washbridge Housing Corp v Tax Comm of City of New York*, 60 Misc 2d 296, 298 [303 NYS2d 308 (1968)], aff'd 32 AD2d 899 [303 NYS2d 336] (1969).

The board, in addition, overlooked the unique status of a federally regulated low income housing project. "The great dilemma in assessing federally assisted housing projects is that the 'value' of these projects is inherently ambiguous. Construction costs are known; but these overstate the market value of a project, since in the absence of subsidy the rental stream produced by the property would not justify the actual expenditure on construction." G. Peterson, A. Solomon, H. Madjid, W. Apgar, Jr., Property Taxes, Housing and the Cities, 73 (1973). Further, federally funded projects are particularly vulnerable to changes in property taxes. *Id.* 74. [377 Mass 354-355.]

The decision of the tribunal is reversed and the case is remanded for reconsideration to take into account the value, if any, of the 5.35 percent mortgage interest subsidy. We express no opinion as to the effect of that subsidy in this case because that decision is to be made initially by the tribunal. We note, however, for whatever bearing it might have on valuation, that the interest subsidy, because it is paid to the mortgagee, is generally not considered to be taxable income to the project owner. See discussion and cases cited in *Moreville House Inc v Comm'r of Corporations and Taxation,*

369 Mass 928; 344 NE2d 878 (1976); but see, *Graff v CIR*, 673 F2d 784 (CA 5, 1982).

No costs are allowed because the appeal included a question of general public significance.