TRADEWINDS EAST ASSOCIATES v HAMPTON CHARTER
TOWNSHIP

Docket No. 84539. Submitted April 16, 1986, at Lansing. Decided
April 7, 1987. Leave to appeal applied for.

Tradewinds East Associates, Limited Dividend Housing Associa-
tion filed a petition in the Michigan Tax Tribunal alleging that
its property had been assessed improperly at an amount above
fifty percent of its true cash value for the tax years 1981, 1982,
1983 and 1984. Respondent, Hampton Charter Township, al-
leged that the property had been assessed at less than fifty
percent of true cash value and requested that petitioner's
assessment be increased. The Tax Tribunal issued an opinion
and judgment in favor of respondent, setting revised assess-
ments for the tax years 1981, 1982, 1983 and 1984. Petitioner
appeals. At issue is the proper method for determining the true
cash value of petitioner's property, a low-income housing proj-
ect located in respondent township, which was built and is
operated under § 236 of the National Housing Act, as amended,
12 USC 1715z-1, and the Michigan State Housing Development
Authority Act, MCL 125.1401 et seq.; MSA 16.114(1) et seq.
(hereafter 236 property).

The Court of Appeals held:

1. It is the duty of the Tax Tribunal to accept the valuation
approach which provides the most accurate valuation under the
circumstances of each case. Here, the tribunal found that the
income approach most accurately reflected the true cash value
of the property. The tribunal accepted respondent's mortgage-
equity formula to derive an overall capitalization rate for use
with the income approach. Such technique was improperly
employed and resulted in a capitalization rate which was too
low and an assessment amount which was too high.

2. The mortgage-equity technique appears to be ill-equipped
to account for the unique mortgage rate feature of § 236
property. Under Michigan case law, the value of an interest

REFERENCES

Am Jur 2d, State and Local Taxation §§ 20, 24, 563, 564, 604, 753,
779, 787.
See the annotations in the Index to Annotations under Taxes.

reduction subsidy should not be taken into account. This feature of a property does not justify a low capitalization rate. Proper application of the mortgage-equity technique in this particular situation requires assumptions which are contrary to Michigan tax law.

3. Michigan case law requires that actual income figures and actual expenses be used to determine the true cash value of property. Such was not done in this case.

4. Section 236 properties present unique return on investment problems which appear to make the mortgage-equity technique ill-suited to the valuation of such properties.

5. The foremost value of § 236 subsidized properties is the tax benefits they generate to the owner. The mortgage-equity technique totally disregards this aspect of the property's value.

6. The Tax Tribunal erred as a matter of law by accepting respondent's figures for both the equity-yield and mortgage rate variables of the mortgage-equity formula in that these figures were not computed according to the basic requirements of the formula itself. The result was a capitalization rate which bore little relationship to the subject property and which appears to be totally arbitrary.

7. The Tax Tribunal erred by relying in part upon respondent's market approach. Respondent's market analysis greatly overestimated the selling price of the comparable properties and consequently over-extrapolated the market value of the subject property.

8. The Tax Tribunal was not required as a matter of law to adopt the approach to valuation applied by the tribunal and affirmed with modification by the Court of Appeals in *Meadowlanes Limited Dividend Housing Ass'n v Holland,* 156 Mich App 238 (1986).

Reversed.

1. TAXATION — JURISDICTION — TAX TRIBUNAL.

The Tax Tribunal has exclusive and original jurisdiction to review final decisions relating to assessments under the property tax laws; a proceeding before the tribunal is independent and de novo (MCL 205.731, 205.737[1]; MSA 7.650[31], 7.650[37][1]).

2. TAXATION — APPEAL — TAX TRIBUNAL — CONSTITUTIONAL LAW.

The Tax Tribunal's failure to base its decision on competent, material and substantial evidence on the whole record is an error of law within the constitutional provision regarding the review of administrative action (Const 1963, art 6, § 28).

3. TAXATION — REAL PROPERTY — TRUE CASH VALUE — CONSTITU-
    TIONAL LAW.

The Legislature is charged with the duty of providing a uniform
system of real property taxation based on assessment of true
cash value; any method for determining true cash value which
is recognized and reasonably related to the fair market value is
an acceptable indication of true cash value; actual income
figures and actual expenses are to be used in determining the
true cash value (Const 1963, art 9, § 3).

4. TAXATION — VALUATION — TAX TRIBUNAL.

It is the duty of the Tax Tribunal to accept the approach to
valuation which provides the most accurate valuation under
the circumstances of each case.

5. TAXATION — TRUE CASH VALUE — INTEREST REDUCTION SUBSIDIES.

The value of an interest reduction subsidy should not be taken
into account in determining the capitalization rate for use in
determining the true cash value of property.

6. TAXATION — VALUATION.

It is error to assume that the outstanding mortgage balance of a
mortgage bearing an interest rate well below market rates has
a dollar for dollar relationship to the value of the property.

*Michaelene K. Young,* for petitioner.

*Bauckham, Reed, Lang, Schaefer, Sparks &
Rolfe, P.C.* (by *Richard D. Reed* and *Lynda E.
Thomsen*), for respondent.

· Before: ALLEN, P.J., and MACKENZIE and J. P.
SWALLOW,* JJ.

MACKENZIE, J. Petitioner appeals as of right
from an opinion and judgment of the Michigan
Tax Tribunal. We reverse.

At issue in this case is the proper method for
determining the true cash value of petitioner's
property, a low-income housing project located in
respondent township, which was built and is oper-
ated under § 236 of the National Housing Act, as

---

* Circuit judge, sitting on the Court of Appeals by assignment.

amended, 12 USC 1715z-1, and the Michigan State Housing Development Authority Act, MCL 125.1401 *et seq.;* MSA 16.114(1) *et seq.* Such property is commonly referred to as "MSHDA 236 property" or simply "236 property." Under this program, the Michigan State Housing Development Authority loans money to developers to build low-income housing and the Department of Housing and Urban Development (HUD) pays all but one percent of the loan interest. In exchange for this subsidy, developers agree to strict regulation by MSHDA, including rent control.

The subject property consists of 150 units in six apartment buildings and fourteen townhouses. It is situated on fifteen acres surrounded by farm land, two miles from a shopping center. The complex was built in 1975. To finance the project, petitioner received from MSHDA a ninety percent loan at 8⅛ percent interest for forty years in the amount of $2,937,700. The interest subsidy, which is paid each month by HUD directly to MSHDA, reduces the effective rate of interest to one percent. Under the terms of its agreement with MSHDA, petitioner can rent only to persons making between fifty percent and eighty percent of the median income level in its area. Rents are determined each year through a budgeting process. The managing agent estimates the amount necessary in the coming year to pay debt service (at the one percent effective rate), administrative and operating expenses, taxes, insurance, a limited dividend to the owners (set by the agreement at six percent of their initial equity/down payment, or $9,792 per year) and reserves. Reserves are of two types, a replacement reserve and a development-cost reserve. The replacement reserves are available to make repairs when needed. The development-cost reserves in-

sure that funds are available to cover unforeseen expenses and necessary improvements.

After estimating expenses, rents are set at a level sufficient to cover the total estimate without surplus. The effect of this procedure passes both the project expenses (including taxes) and the government subsidy on to the *tenants* in the form of reduced rents. If expenses are underestimated in the budgeting process or rents for some other reason fail to cover expenses, the owners are not permitted to withdraw their six percent limited dividend. If operating income is still insufficient, the owners are responsible for making up the deficit. As of the date of the hearing, the owners had never received a limited dividend. There was no testimony whether it had ever been necessary for the owners to pay funds to make up a shortfall in operating income.

MSHDA also controls the project in several other respects. It must approve all rent schedules. It inspects the physical condition of the property at least once a year and has the power to order repairs. The project cannot be sold without MSHDA approval. Rents cannot be raised to accommodate a new debt created by a sale. The mortgage is tied to the property; it cannot be paid off and cannot be refinanced for a period of twenty years, in the instant case, until 1994.

On June 25, 1981, petitioner filed a petition in the Tax Tribunal, alleging that the value of its property had been assessed at $1,366,700 for 1981 taxes and that this amount was $454,200 above fifty percent of the property's true cash value. Petitioner subsequently amended its petition to challenge assessments for the 1982, 1983 and 1984 tax years. Respondent, on the other hand, alleged that the property had been assessed at less than fifty percent of true cash value and requested that

petitioner's assessment be increased. Following a hearing, the Tax Tribunal issued an opinion and judgment in favor of respondent. The opinion and judgment set revised assessments for the tax years 1981 to 1984 at $1,480,950, $1,481,550, $1,482,925 and $1,497,700, respectively. It is from this judgment that petitioner appeals.

The Tax Tribunal has exclusive and original jurisdiction to review final decisions relating to assessments under the property tax laws. MCL 205.731; MSA 7.650(31). A proceeding before the tribunal is independent and de novo. *Consolidated Aluminum Corp, Inc v Richmond Twp,* 88 Mich App 229, 232-233; 276 NW2d 566 (1979); MCL 205.737(1); MSA 7.650(37)(1).

This Court's review of tribunal decisions is provided by Const 1963, art 6, § 28:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record. Findings of fact in workmen's compensation proceedings shall be conclusive in the absence of fraud unless otherwise provided by law.
>
> In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation.

Since the instant case involves an assessment dispute, the constitutional limitation applies. The

precise meaning of the limitation, however, is unclear. This Court has occasionally stated that it is bound by the tribunal's factual determinations and may consider only questions of law. See, e.g., *Alhi Development Co v Orion Twp,* 110 Mich App 764, 767; 314 NW2d 479 (1981). The general view, however, appears to be that the tribunal's failure to base its decision on competent, material and substantial evidence on the whole record is an error of law within the meaning of Const 1963, art 6, § 28. See *Antisdale v Galesburg,* 420 Mich 265, 277; 362 NW2d 632 (1984); *Teledyne Continental Motors v Muskegon Twp,* 145 Mich App 749; 378 NW2d 590 (1985); *Kern v Pontiac Twp,* 93 Mich App 612, 620; 287 NW2d 603 (1979).

The Legislature is charged with the duty of providing a uniform system of real property taxation based on assessment of true cash value (hereafter TCV). Const 1963, art 9, § 3. Typically, "cash value" means "usual selling price," meaning the price which could be obtained at a private, not forced, sale. MCL 211.27; MSA 7.27. Tcv and "fair market value" are synonymous. *CAF Investment Co v State Tax Comm,* 392 Mich 442, 450; 221 NW2d 588 (1974).

Any method for determining TCV which is recognized and reasonably related to the fair market value is an acceptable indication of TCV. *Presque Isle Harbor Water Co v Presque Isle Twp,* 130 Mich App 182, 190; 344 NW2d 285 (1983). Generally, there are three accepted methods of valuation: the capitalization-of-income approach the cost-less-depreciation approach, and the market approach. Each of these approaches is briefly described in *Antisdale, supra,* p 276-277, n 1. It is the duty of the Tax Tribunal to accept the approach which provides the most accurate valuation under the circumstances of each case. *Id.,* p 277.

In the instant case, the Tax Tribunal found that the income approach most accurately reflected the true cash value of the subject property. Under this approach, the appraiser converts a stream of income into a value for the entire property. For example, if a property produces an annual income of $100,000 and ten percent is accepted as an appropriate rate of return, the property is valued at $1,000,000 because it would take that amount of cash invested at ten percent to produce the same amount of income. If five percent is adopted as the capitalization rate, the property would be valued at $2,000,000. If twenty percent is accepted, the value would be $500,000. Thus, the lower the capitalization rate, the higher the value of the property and vice versa. As is apparent, the most difficult aspect of the income approach is determining the proper capitalization rate.

At the hearing before the Tax Tribunal, petitioner presented the testimony of appraiser Laurence Allen who advocated an income approach to valuation which takes into account an equity component and a mortgage component. The basics of this approach are described in *Meadowlanes Limited Dividend Housing Ass'n v Holland,* 156 Mich App 238; 401 NW2d 620 (1986). Using this approach, Allen concluded that the value of the subject property for each tax date in dispute was:

|  | 12/31/80 | 12/31/81 | 12/31/82 | 12/31/83 |
|---|---|---|---|---|
| Equity |  |  |  |  |
| Cash Flow | 49,039 | 48,074 | 46,935 | 45,592 |
| Tax Shelter | 235,080 | 616,458 | 595,753 | 571,386 |
| Reversion | 39,351 | 19,024 | 23,945 | 29,958 |
| Mortgage | 981,534 | 782,267 | 1,183,942 | 1,264,037 |
| Total Value | 1,305,003 | 1,465,823 | 1,850,576 | 1,911,003 |
| Escrow |  |  |  |  |
| Balances | (236,390) | (219,702) | (258,269) | (319,538) |
| Total Real |  |  |  |  |
| Estate Value | 1,068,613 | 1,246,121 | 1,592,307 | 1,591,465 |
| Rounded Value | 1,070,000 | 1,250,000 | 1,600,000 | 1,600,000 |

In reaching these amounts, Allen valued the reversion by projecting the amount of net operating income in 1994 (when petitioner would first have the option of leaving the MSHDA program), capitalizing it at a twelve percent overall rate plus a 2.5 percent tax capitalization rate, i.e., at 14.5 percent, and then discounting the result to present value. Allen used a twelve percent overall capitalization rate because he believed that was a typical rate "for market projects, on a cash basis." There is nothing to indicate that this rate was supported by a market study.

Respondent presented the testimony of its assessor, David Swinson, and investment analyst, Irvin E. Johnson, whose "mortgage equity" method Swinson used to value petitioner's property under the income approach. Using this method, Swinson first determined that petitioner's net operating income for the four years in dispute was $182,040, $192,373, $180,525 and $215,169, respectively, excluding debt service. Next, to determine capitalization rate, Swinson used the "mortgage-equity" technique as developed by Mr. Johnson. Under this technique, the capitalization rate is determined by plugging six factors into a formula. The formula was never introduced into evidence and was never thoroughly explained. Generally, appraisers are able to derive the proper capitalization rate using Mr. Johnson's technique by reference to precomputed tables such as those contained on the 350 pages at the end of Johnson's book, *Instant Mortgage-Equity* (Lexington, Mass: DC Heath & Co, 1980). However, because the factors which Swinson selected fell outside these tables, Swinson had to supply the factor values to Mr. Johnson for special computation.

The six factors and the values which Swinson selected are:

| | |
|---|---|
| Equity Yield Rate (per regulatory agreement) | 6.0 percent |
| Holding Period (per resale of comparables) | seven years |
| Loan Ratio (per regulatory agreement and mortgage) | ninety percent |
| Interest Rate (per mortgage) | 8⅛ percent |
| Loan Amortization Term (per mortgage) | forty years |
| Appreciation (four percent per year, compounded) | thirty percent |

From these factors, Johnson computed the proper overall rate of capitalization to be 4.30131 percent. To this was added an effective tax capitalization rate of approximately 2.5 percent for each tax year in dispute. Using a total capitalization rate of approximately 6.85 percent for each year in question, Swinson then determined that the value of the subject property under the income approach in rounded figures was $2,700,000, $2,800,000, $2,600,000, and $3,100,000, respectively. Swinson testified that if he had used one percent for the interest rate factor, instead of the 8⅛ percent listed in the mortgage with MSHDA, the property's value "would increase significantly." Moreover, while Swinson testified that the "main benefit" of owning the subject property arose from income tax savings, Swinson acknowledged that the mortgage-equity capitalization technique which he had employed did not take tax savings into consideration. If it had, the appraisal would have been "much higher."

The tribunal accepted respondent's mortgage-equity formula to derive an overall capitalization rate. Petitioner argues that this technique was improperly employed and resulted in a capitalization rate which was too low and, accordingly, an

assessment amount which was too high. We must agree, for several reasons.

First, as presented here, the mortgage-equity technique appears to be ill-equipped to account for the unique mortgage rate feature of 236 properties. The technique assumes that a sale of the subject property has just occurred. In his book, *Mini-Math for Appraisers* (Chicago: International Ass'n of Assessing Officers, 1974), p 51, Mr. Johnson states:

> An appraisal for market value assumes the property to be encumbered by a new maximum institutional loan at current interest rates. It is also assumed that the buyer pays cash to the new loan, thereby automatically adjusting the market price to a cash equivalent. Market value is considered to be the value to persons in general, without being related to income tax brackets or unusual financing.

An appraiser effectuates these assumptions by compiling data and determining six variables. Johnson testified that it is "critical" that all data be extracted from the particular submarket in which the subject property is located. Otherwise value would be distorted.

In the instant case, as Johnson testified, one percent effective interest is typical financing within the instant submarket. In order to properly employ the mortgage equity technique, therefore, this interest rate should be used. However, the low interest rate results from the government subsidy and therefore a valuation approach which values the financing at the one percent level has the effect of valuing the subsidy. Under Michigan case law, the value of an interest reduction subsidy should not be taken into account. It has been held that this feature of a property does not justify a

low capitalization rate. *Congresshills Apartments v Ypsilanti Twp (After Remand)*, 128 Mich App 279, 285-286; 341 NW2d 121 (1983) *(Congresshills II)*.[1] Thus, proper application of the mortgage-

---

[1] To the extent that *Meadowlanes, supra*, holds that under *Antisdale, supra*, and *Washtenaw Co v State Tax Comm*, 422 Mich 346; 373 NW2d 697 (1985), the value of a mortgage subsidy, if any, *may* be included in a real property valuation, we disagree with the *Meadowlanes* panel. In our opinion, *Meadowlanes* erroneously characterized the interest subsidy as a "premiere feature of the tax shelter." Indeed, the interest subsidy has very little to do directly with the tax shelter aspect of 236 properties. The tax shelter is based on *depreciation* which is computed from the face amount of the mortgage, not the interest rate. Although we recognize that investors may also take interest payments as deductions, we doubt that they may deduct the interest which the government pays. This supposition is supported by *Meadowlanes, supra*, p 252, where it is noted that the subsidy is not treated as taxable income to the project's owner. We assume that if receipt of the subsidy is not income to the project's owner, its payment to the mortgagee may not be treated as an expense (and thus taken as a deduction). Thus, it appears that the interest subsidy has practically no effect on the tax shelter aspects of the property.

More fundamentally, we think that the *Meadowlanes* holding is based upon a faulty premise, i.e., that a 236 property buyer would be benefited by a one percent mortgage. While that would normally appear to be a logical assumption, *Meadowlanes* fails to take into account the effect of the federal government's involvement in 236 properties. The government regulations require that the subsidy flow to the *tenants* in the form of reduced rents, not to the property owners. Because the subsidy reduces rent and does not go into the owner's pocket, a reasonable buyer would not be willing to pay more for the property because of this feature. It follows that the one percent mortgage does not increase the value of the property. Contrary to the conclusion in *Meadowlanes*, the one percent mortgage (or, in other words, the subsidy) would *not* be a significant component of a hypothetical sale. Thus, the language in *Washtenaw Co, supra*, p 365, that significant components of sale price should be considered in determining the value of a property, is inapplicable. Again, the subsidy goes to the tenants, not the property owners.

It is true that the Supreme Court in *Antisdale, supra*, p 284 concluded that "[w]ithout the federally subsidized mortgage such properties would be nearly worthless." But that does not mean the subsidy should be valued for property tax purposes. The reason is that value for the property tax purpose is defined in market terms. In *Antisdale*, the Supreme Court also said that it is feasible that as soon as such projects are constructed, they possess market values less than one-half their cost to construct and without the subsidy such projects would not be built. These statements indicate that such projects are bought and sold only with the subsidy in place. To value the subsidy would be to assume otherwise.

equity technique in this particular situation requires assumptions which are contrary to Michigan tax law.

To get around this problem, Swinson used 8⅛ percent interest for the mortgage rate factor, the rate stated in the mortgage agreement. However, use of this rate was also improper under the mortgage-equity technique since it was not a "current rate" selected from either the submarket or the general market and had no relationship to the value of the property either originally or during the disputed tax years. Since HUD pays the difference between the stated rate, whatever it is, and one percent, the stated rate in the mortgage could have been fifteen percent or three percent and neither rate would have affected the actual expenses of the subject property or its actual operating income. Michigan case law requires that actual income figures and actual expenses be used to

Theoretically, the rent restrictions and regulations have a negative value while the interest subsidy has a positive value. Having to be bound by the restrictions would appear to be the price the property owner pays for the subsidy. Thus, it would appear that the restrictions have a value roughly equal to the value of the subsidy and that they cancel each other out. By not valuing the subsidy, one does away with the necessity of subtracting the negative value of the restrictions. Thus, it seems an approach which includes a value for the subsidy but does not subtract the negative value of the government restrictions would be inaccurate.

The problem in cases such as this is that 236 properties do not operate within market principles and are restricted by government regulations designed to keep revenues low, not to maximize profit. In our opinion, the *Congresshills II* approach is the correct approach if we are to use a market definition of value in this context. The *Congresshills II* approach demonstrates that projects such as the one in the instant case have a market value equal to little more than the value of the ability to pay off the property's mortgage at a one percent effective rate. To conclude that such projects have the ability to support the one percent effective rate plus the federal interest subsidy is to conclude that such projects could and would have been built in the free market even without government assistance. Such a holding is diametrically opposite of the Supreme Court's finding in *Antisdale* that such property would not have been built without government subsidy.

determine TCV of property. *Congresshills Apartments v Ypsilanti Twp,* 102 Mich App 668, 678; 302 NW2d 274 (1981) *(Congresshills I).*

Second, 236 properties present unique return on investment problems which appear to make the mortgage-equity technique ill-suited to the valuation of such properties. In this case, Swinson selected six percent for the formula's equity-yield factor, because this was the maximum amount permitted under the regulatory agreement as a return on the investor's down payment. However, the uncontroverted testimony indicated that the owners had never received this amount. Also, under the mortgage-equity technique, the "yield on equity" variable is to be determined by yield over the entire length of the assumed holding period and includes the "net reversion" (resale value at the end of the holding period less loan value) in addition to cash flow. See Irvin E. Johnson, *Instant Mortgage-Equity, supra,* p 3. Respondent purported to compute only cash flow. Moreover, the six percent, as the yield on equity, was not an actual rate of return and had little relationship to the value of the property.

Third, in *Antisdale, supra,* p 285, our Supreme Court recognized that the foremost value of 236 subsidized properties is the tax benefits they generate to the owner. The mortgage-equity technique, however, totally disregards this aspect of the property's value.

The mortgage-equity technique creates an impression of accuracy; Johnson himself touted the technique as "a magic formula." Nevertheless, no formula can be any more accurate than the variables upon which it relies. In this case we are convinced that the Tax Tribunal erred as a matter of law by accepting respondent's figures for both the equity-yield and mortgage rate variables of the

mortgage-equity formula, in that these figures were not computed according to the basic requirements of the formula itself.[2] What resulted was a capitalization rate which bore little relationship to the subject property and which appears to be totally arbitrary. We note, for example, that in *Congresshills II, supra,* p 286, this Court held that 6.24 percent, 6.1895 percent and 6.201 percent capitalization rates for 236 property were " 'absurdly low' and erroneous as a matter of law."

In our opinion, the tribunal also erred by relying in part upon respondent's market approach. In *Antisdale, supra,* p 281, which was decided after the tribunal's decision in the instant case, our Supreme Court held that it is error to assume that "the outstanding mortgage balance of a mortgage bearing an interest rate well below market rates has a dollar for dollar relationship to the value of the property." The Court wrote:

> As an example, in the present case, the hypothetical purchaser of the subject property would have to assume, approximately, a mortgage with a principal balance of $1,500,000. That amount, however, is subject to an interest rate of only 1% and is payable over 40 years. Under the terms of the mortgage, monthly payments of $3,764 were necessary. Petitioners submitted evidence which showed that an investment of $433,232 at an interest rate of 10.25 percent would generate enough income to make those $3,764 payments. To say that the mortgage balance had a value of $1,500,000 when it could be entirely assumed by giving up the use of $433,232 is to give an entirely new and foreign meaning to the word value. By failing to discount the outstanding mortgage balance of the comparable properties to the actual cost to the investor the Tax Tribunal adopted a wrong principle. [*Id.,* pp 282-283.]

---

[2] We express no opinion concerning whether the other factors were properly selected.

See also, *Washtenaw Co v State Tax Comm,* 422
Mich 346; 373 NW2d 697 (1985).

In the instant case, respondent determined the
sale price of each comparable by adding the face
amount of the down payments, the purchase
money mortgage notes and the balance of the
assumed mortgages. In each case, the assumed
mortgage represented over seventy percent of the
sale price. Thus, by failing to discount the bal-
ances of the assumed mortgages, respondent's mar-
ket analysis greatly overestimated the "selling
price" of the comparable properties and conse-
quently over-extrapolated the market value of the
subject property.[3]

Petitioner also argues that the Tax Tribunal
erred as a matter of law in not applying to this
case the approach to valuation applied by the
tribunal in *Meadowlanes,* Michigan Tax Tribunal
No. 55933, decided January 6, 1984, which has
since been affirmed with modification by this
Court. *Meadowlanes, supra.* We disagree. In *CAF
Investment Co, supra,* p 450, n 2, our Supreme
Court stated:

> The methods to be used by the assessor are a
> matter for decision at the assessing level . . . .
> Any method for determination of true cash value
> which is recognized as accurate and reasonably
> related to fair market valuation will fill the statu-
> tory prescription and is an acceptable indicator of
> true cash value.

In our opinion, the Tax Tribunal was not required

---

[3] Nor does evidence of a recent resyndication proposal submitted to
MSHDA nine months after the last tax day in dispute support the
tribunal's assessment of $3,000,000 for each tax year. Even though
the sum of the adjusted terms of the proposal was $4,910,000, dis-
counting both the promissory note and the mortgage balance and
subtracting appreciation, if any, would bring this figure well below
$3,000,000.

as a matter of law to adopt the *Meadowlanes*
approach.

Reversed.